UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,       )
                                )
                                )
v.                              )       CRIMINAL ACTION NO.
                                )       13-10325-DPW
DAVID DARDY,                    )
                                )
            Defendant.          )

MEMORANDUM
September 8, 2015

Defendant David Dardy moved to suppress physical evidence

obtained during a search of a vehicle in which he was a

passenger and a subsequent search of his person on July 11,

2013.  He also moved to suppress statements made following these

searches by him and his fellow passenger.  I conducted an

evidentiary hearing on the motion to determine whether a valid

traffic stop occurred.  For the following reasons, I have denied

Dardy's motion to suppress.

## I. BACKGROUND

### A.  *Findings of Fact*[1]

1.  The Traffic Stop

Around 1:45 a.m. on July 11, 2013, Officers Antoine Ramos

---

[1] The facts are drawn from the live testimony of the witnesses at
the motion to suppress hearing I held on December 19, 2014, as
well as from the police reports, photographs, and other
documents submitted by the parties.

1

and Joseph McDonough of the Boston Police Department were
patrolling the area between the St. Joseph's and Warren Gardens
housing complexes in Roxbury due to an earlier shooting there.[2]
As they were driving down Wakullah Street, Officer McDonough
observed a dark-colored livery car parked in front of 4 Wakullah
Street.  Because the car was parked in front of a known gang
member's house in an area very near the recent shooting, the
officers had an interest in watching the car for "any movement."
Wakullah Street is a one-way street that lets out onto Rockland
Street.  The officers parked their marked cruiser on Rockland
Street, where they could not see anyone entering or exiting the
car.  Officer McDonough then observed the livery car drive along
Wakullah Street, turn left on Rockland Street (where the
officers were parked), follow Rockland Street around a bend, and
drive toward the intersection of Rockland and Dale Streets.

    The livery car driver had been dispatched to 4 Wakullah
Street and picked up three male passengers there.  According to
the driver, the men were indecisive about where they wanted to
go.  As the livery car drove down Rockland Street, toward Dale

---

[2] Shortly after midnight on July 11, Terrence Belmer was shot at
the Warren Gardens housing complex.  When interviewed at the
hospital, Belmer reported that he had been attacked by two
light-skinned, black males dressed in red hooded sweatshirts.
At the time, there was an ongoing dispute between residents of
Warren Gardens and the nearby St. Joseph's housing complex.

Street, the officers followed in their cruiser, beginning about thirty yards away from it and coming within ten to fifteen yards of the car before it reached the intersection of Rockland and Dale Streets.

The intersection of Rockland and Dale Streets contains a stop sign and a crosswalk, but no stop line.  By Officer McDonough's account, which I credit, the livery car was driving at a "normal" speed and slowed down as it approached the intersection.  However, the car did not stop at or before the stop sign, and instead drove through the intersection at approximately five miles an hour before coming to a complete stop in the middle of the intersection, within eight to ten feet of the edge of the crosswalk.

By the livery driver's account, this aspect of which I credit, as he was reaching the intersection of Rockland and Dale Streets, the passengers were undecided as to where they wanted to go.  One of the passengers instructed him to turn right while another instructed him to turn left.  Because of this confusion and his efforts to learn their destination, the driver was not entirely attentive to when and where he came to a complete stop.

Although the livery driver has provided various contradictory testimony regarding the matter, I find that he did not come to a full stop before the stop sign, but at most

3

slowed down while trying to decipher where the passengers wanted to go.[3]

On the basis that the driver had violated a traffic law by failing to stop at the stop sign, Officer McDonough activated the emergency lights and sirens on his police cruiser to conduct a traffic stop.

### 2.  Events Following the Traffic Stop

After Officer McDonough activated his lights and sirens, the livery car turned right on Dale Street, seemingly in response to the indication that it was being stopped by the police cruiser.  As the car came to a complete stop, the rear passenger side door of the car opened and a man exited quickly, running away from the officers along Dale Street toward Washington Street.  Officers Ramos and McDonough immediately

---

[3] The driver testified variably at the evidentiary hearing that he made several stops on Rockland Street both before and after the stop sign, that he did stop before the crosswalk, and that he did not come to a complete stop before the crosswalk.  The driver illustrated similar confusion — whether due to language issues, lack of recollection or apprehension about the consequences he might face — in his grand jury testimony and his interview with the police.  Although the driver provided some testimony supporting the contention that he came to a full stop before the stop sign, I consider his testimony overall to support the conclusion that he did not do so.  This is consistent with Officer McDonough's testimony that the car actually stopped in the middle of the intersection, as if the driver were confused.

pursued the fleeing man.  Officer McDonough observed that the
man held his right arm close to his side, while pumping his left
arm, which in the officer's experience indicated illegal
possession of a weapon.

Officers John Quinn and Jeff Connolly, who were in plain
clothes in an unmarked but recognizable police vehicle, were
also patrolling the area when they turned onto Dale Street from
Washington Street and saw the stopped cars and the chase
underway.  Officer Quinn joined the pursuit, while Officer
Connolly heeded Officer McDonough's instruction over the radio
to stay with the stopped car.

Officer Connolly heard from Officer McDonough that there
were more people in the stopped livery car, and understood that
he should investigate, despite not knowing the reason for the
initial stop or why one of the passengers had fled.  He had,
however, made the same observation as Officer Quinn that the
fleeing man held one arm close to his waistband.  He approached
the car with his flashlight and firearm in the "low ready
position" yelling "show me your hands," and observed a driver
and two men in the rear of the vehicle who were moving around.

The driver had his hands on the steering wheel, and Officer
Connolly concluded that he did not pose an immediate threat.
The officer observed the passenger on the driver's side, Antoine

Brown, place his hands near his chest or chin.  Officer Connolly
also observed Dardy, the passenger who was seated in the middle,
"move down forward in a crouching position" toward the passenger
seat, such that the officer lost sight of him.  The livery
driver stated that he believed, and I credit as true, that Dardy
was trying to hide something made of metal under the front
passenger seat, but there was an iron bar blocking the space.

Officer Connolly gave verbal commands for Brown, who was
closest to him, to exit the vehicle.  Brown did not respond
quickly enough, so the officer opened the back driver's side
door and removed him.  After removing Brown, Officer Connolly
immediately went back into the vehicle with his flashlight and
firearm and again observed Dardy leaning down in a crouched
position and saw that his hands were on a firearm on the floor
between his feet.  Officer Connolly ordered Dardy to put his
hands by his face, and Dardy complied.  He then ordered Dardy to
get out of the vehicle and lie on the ground, which Dardy did.
The driver was not ordered out of the car until another officer
arrived on the scene.

After another officer arrived, Brown, Dardy, and the driver
were placed in handcuffs.  The driver, having learned about the
gun from the officers, gave them permission to search the
vehicle.  Officer Connolly also conducted a patfrisk search of

6

Dardy and recovered from his sock six individually wrapped items that appeared to be crack cocaine.  The gun was not removed from the car until detectives arrived.

## B.   *Procedural History*

Dardy was arrested on July 11, 2013 following the patfrisk search.  He was indicted by a grand jury on November 13, 2013, on one count of possession of a firearm and ammunition by a felon, in violation of 18 U.S.C. § 922(g)(1).  After a hearing on his motion to suppress during which I announced I would deny it, Dardy unconditionally pled guilty.  These findings and conclusions are set forth herein to provide Dardy — before his sentencing hearing — with a full statement of my reasoning for denying his motion to suppress.

## II. DISCUSSION

## A.   *Legal Standard*

The Fourth Amendment prohibits unreasonable searches and seizures.  *Terry* v. *Ohio*, 392 U.S. 1, 9 (1968).  Searches conducted without a warrant supported by probable cause are presumptively unreasonable absent a recognized exception to the warrant requirement.  *United States* v. *McGregor*, 650 F.3d 813, 820 (1st Cir. 2011).  Observation of a traffic offense can provide such an exception.  *Id.*  "An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is

just an excuse to investigate something else," and "can order
the occupants out of the auto." *Id.* (citing *Whren* v. *United
States*, 517 U.S. 806, 810 (1996); *Maryland* v. *Wilson*, 519 U.S.
408, 410, 414-15 (1997)).  An officer can then conduct patfrisk
searches of the occupants and search the interior of the vehicle
for protective purposes only if "he has some articulable,
reasonable suspicion that the persons stopped may be dangerous."
*Id.*

The First Circuit has identified a two-step inquiry for
assessing the reasonableness of searches conducted in the
context of a traffic stop.  Under this inquiry, I ask first
whether the officer "was justified in making the stop," and
second, whether "the protective search [was] reasonably related
to the events justifying the stop, factoring in what happened
and what [the officer] learned during the encounter." *Id.*  I
must also address whether Dardy, as a passenger in a livery
vehicle, had standing to challenge the searches and seizures
that followed the traffic stop.

**B.  *Analysis***

Dardy argued that the fruits of the officers' searches and
seizures, including statements he subsequently made, should be
suppressed because the traffic stop was unlawful, and, even if

8

the stop was lawful, the subsequent searches and seizures were not supported by a reasonable basis.  I disagree.

### 1.  The Traffic Stop Was Lawful

An officer must have reasonable suspicion that a motor vehicle violation has occurred in order to make a lawful investigatory stop under *Terry*.[4]  *See United States* v. *Coplin*, 463 F.3d 96, 97, 101 (1st Cir. 2006).  As long as the suspicion of a violation is plausible and reasonable, an officer's mistaken view of the facts will not render the stop unlawful. *Id.*  Under Massachusetts law, the failure to stop at a clearly marked stop line or before entering a crosswalk where there is a posted stop sign constitutes a traffic violation punishable by a fine.  *See* Mass. Gen. Laws ch. 89, § 9.[5]

I find Officer McDonough reasonably believed that the driver did not stop before the crosswalk at the intersection of

---

[4] The government acknowledged that at the time of the traffic stop, the officers did not have reasonable suspicion to believe that the occupants of the car were associated with the earlier shooting in the area or were going to commit a crime.  The only basis for the stop, then, was the commission of a traffic offense.

[5] Massachusetts General Laws ch. 89, § 9, provides in relevant part: "Except when directed to proceed by a police officer, every driver of a vehicle approaching a stop sign or a flashing red signal indication shall stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection, or, if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering it."

Rockland and Dale Streets and therefore violated Mass. Gen. Laws ch. 89, § 9.[6] The driver, distracted by his passengers' disagreement as to their destination, did not come to a complete stop until the car had already entered the intersection. Under these circumstances, the officer's suspicion of a violation was objectively reasonable. *See Coplin*, 463 F.3d at 101 (discussing *United States* v. *Fox*, 393 F.3d 52 (1st Cir. 2004)); *see also Commonwealth* v. *Torres*, 745 N.E.2d 945, 947, 949 (Mass. 2001). Accordingly, the traffic stop was lawful, and the first *Terry* condition was satisfied.[7] *See Arizona* v. *Johnson*, 555 U.S. 323,

---

[6] I also concluded an actual view of the scene was not necessary before making this finding. The parties submitted numerous photographs of the intersection in question, and at the hearing both counsel and I reviewed in detail the car's location at the intersection with the witnesses.

[7] Contrary to the defendant's assertions, more is not required under the case law, even where the defendant was a passenger rather than the driver committing the traffic violation. Relying on recent First Circuit decisions in *United States* v. *Arnott*, 758 F.3d 40 (1st Cir. 2014) and *United States* v. *Arthur*, 764 F.3d 92 (1st Cir. 2014), the defendant contended that the stop was unlawful first because there was no basis to believe that the driver failed to stop at the stop sign, and second because the officers did not have any "reasonable and articulable suspicion of criminal activity," warranting an investigatory seizure of the vehicle (quoting *United States* v. *Cook*, 277 F.3d 82, 85 (1st Cir. 2002)). Because I reject the defendant's first argument and conclude that the officers reasonably believed that a traffic violation had occurred, additional suspicion of criminal activity is not required. *See United States* v. *Andrade*, 94 F.3d 9, 12 (1st Cir. 1996) ("temporary detention of a motorist upon probable cause to believe the traffic laws have been violated does not transgress the Fourth Amendment's prohibition on unreasonable seizures").

327 (2009).

2.   Dardy Has "Standing" to Challenge the Searches and
     Seizures Following the Traffic Stop

Before addressing whether the *Terry/McGregor* inquiry is
satisfied, I consider a threshold issue regarding Dardy's
standing to challenge searches following the traffic stop.
There is no question that Dardy, as a passenger in the livery
car, had a right to challenge the propriety of the traffic stop
under the Fourth Amendment.  *See United States* v. *Starks*, 769
F.3d 83, 89 (1st Cir. 2014) (citing *Brendlin* v. *California*, 551
U.S. 249, 251 (2007)); *United States* v. *Woodrum*, 202 F.3d 1, 6
(1st Cir. 2000).  The question at this point is whether he had a
reasonable expectation of privacy in the vehicle such that he
had standing to challenge the searches and seizures that
followed the traffic stop.

Establishing a reasonable expectation of privacy in the
area searched or the items seized is a threshold requirement for
a Fourth Amendment analysis.  *United States* v. *Lewis*, 40 F.3d

---

The suspected traffic violation itself serves as "an
independently sufficient ground for stopping the car."  *Arnott*,
758 F.3d at 44 n.5; *see Arizona* v. *Johnson*, 555 U.S. 323, 327
(2009) ("The police need not have, in addition, cause to believe
any occupant of the vehicle is involved in criminal activity.").
*Arnott* affirms this proposition, and *Arthur* involves facts far
too different from the instant case to provide meaningful
comparison.

1325, 1333 (1st Cir. 1994).  Determining whether a person has a
reasonable expectation of privacy in a vehicle aside from
ownership entails consideration of numerous factors, including
"possession, and/or control; . . . ability to regulate access;
the totality of the surrounding circumstances; the existence or
nonexistence of a subjective anticipation of privacy; and the
objective reasonableness of such an expectancy under the facts
of a given case."  *United States* v. *Almeida*, 748 F.3d 41, 47
(1st Cir. 2014) (quoting *United States* v. *Aguirre*, 839 F.2d 854,
856-57 (1st Cir. 1988)).  This inquiry asks "whether or not the
individual thought of the place . . . as a private one, and
treated it as such."  *Id.*

Dardy asserted that a passenger in a livery car has a
reasonable expectation of privacy in the passenger area, as that
area functions as a private space during a passenger's
contracted time of use.  In *Katz* v. *United States*, 389 U.S. 347,
351-52 (1967), the U.S. Supreme Court recognized that "what [a
person] seeks to preserve as private, even in an area accessible
to the public, may be constitutionally protected."  The Court
concluded that a person who has shut the door to a telephone
booth and paid to use it has a reasonable expectation of privacy
in the conversations had there.  *Id.* at 352-53.  Some courts in
other circuits have recognized such a privacy expectation for a

12

paying taxi passenger in the rear passenger area. *See, e.g.*, *United States* v. *Santiago*, 950 F. Supp. 590, 597-98 (S.D.N.Y. 1996) (concluding that taxi passenger has reasonable privacy expectation that is accepted by society, and citing other state courts reaching same conclusion, because unlike typical car passenger, who does not have right to privacy in car, taxi passenger "may exclude others from the cab, as he has hired the cab for his exclusive use for the duration of the trip," and passenger area therefore effectively "belongs to the passenger who pays for it during the course of the trip"). *But see United States* v. *Buckner*, 417 F. Supp. 2d 240, 241-42 (S.D.N.Y. 2005) (concluding that livery passenger did not have reasonable privacy expectation in area underneath front passenger seat); *cf. United States* v. *Bulluck*, No. 09-cr-652 (PGG), 2010 WL 1948591, at *10-18, *20 (S.D.N.Y. May 13, 2010) (rejecting *Santiago*), *remanded on other grounds*, 556 F. App'x 20-22 (2d Cir. 2014) (unpublished), *on remand*, 2015 WL 4998573, at *12 (S.D.N.Y. Aug. 20, 2015) (search of bags in cab conducted pursuant to valid "automobile frisk"). Dardy has pointed to additional factors, such as the lesser government regulation of livery cars and their exemption from window tint requirements, to suggest that a livery car confers an even greater expectation of privacy than a standard taxi.

13

The First Circuit has largely rejected any privacy
expectation for vehicle passengers.  It has observed that "a
passenger who has 'asserted neither a property nor a possessory
interest in the automobile, nor an interest in the property
seized,' has made no showing that he or she has a legitimate
expectation of privacy in . . . the area under the seat of the
car in which he or she was 'merely [a] passenger [ ].'"  *United
States* v. *Symonevich*, 688 F.3d 12, 19 (1st Cir. 2012) (quoting
*Rakas* v. *Illinois*, 439 U.S. 128, 148 (1978) (some alterations in
original)).  The *Symonevich* court rejected the defendant's
argument that two Supreme Court decisions, *Arizona* v. *Johnson*,
555 U.S. 323 (2009), and *Brendlin* v. *California*, 551 U.S. 249
(2007), served to "extend Fourth Amendment rights to passengers"
challenging a vehicle search, and accordingly concluded that the
defendant did not have a reasonable expectation of privacy as a
passenger on a six-hour, round-trip car ride between Maine and
Massachusetts.  *See Symonevich*, 688 F.3d at 19; *see also
Almeida*, 748 F.3d at 47 ("a person who is merely a passenger
does not have a reasonable expectation of privacy in a vehicle"
(internal quotation marks and citation omitted)).

The First Circuit has not explicitly recognized a privacy
expectation for taxi or livery car passengers as an exception to

14

this general approach.[8]   The court has, however, indicated that

it would recognize a greater privacy expectation for a paying

passenger.   In *Woodrum*, the First Circuit considered whether a

paying passenger had a reasonable expectation of privacy in the

passenger area of a taxicab that was enrolled in the Boston

Police Department's Taxi Inspection Program for Safety (TIPS).

*Woodrum*, 202 F.3d at 3-4.   Participation in TIPS required taxi

owners to place three decals — two on the rear side windows and

a third inside the rear passenger area — informing passengers of

the program and the possibility that the taxi would be stopped

and inspected by the police at any time.   *Id.*   In considering

the trial judge's denial of the defendant's motion to suppress

evidence obtained as a result of the stop of a TIPS-enrolled

taxi in which he was a passenger, the First Circuit stated:

> A taxi fare – who by definition has contracted to pay
> for both the right to exclude others from the cab and
> the right to control its destination in certain
> respects – has a reasonable expectation that he will
> not gratuitously be seized while en route. . . .
> Absent a warrant, the police can intrude on such an

---

[8] The cases the defendant has cited, *Stoner* v. *California*, 376
U.S. 483 (1964), and *United States* v. *Werra*, 638 F.3d 326, 336
(1st Cir. 2011), do not provide the necessary support for the
contention that an objective privacy expectation of livery car
passengers must be recognized in this circuit.   Given the
extensive case law on vehicular passengers in other
jurisdictions, cases such as *Stoner* and *Werra* pertaining to
hotels, rooming houses, and residences are not particularly
instructive.

expectation only in a few carefully circumscribed
kinds of situations.

*Id.* at 6 (citing *Rios* v. *United States*, 364 U.S. 253, 261
(1960); *Townes* v. *City of New York*, 176 F.3d 138, 144 (2d Cir.
1999)).  However, the court also noted that under the case law
at the time, "a mere passenger has a right to protest a traffic
stop . . . but no corresponding right to protect the search of
someone else's vehicle."  *Id.* at 10 (citations omitted).  This
reasoning is consistent with that employed by courts that
recognize a privacy expectation for taxi passengers
specifically.  *See, e.g.*, *Santiago*, 950 F. Supp. at 597-98.

In the context of the TIPS program, the *Woodrum* court
reasoned that the driver and a paying passenger share authority
over the vehicle, but that by entering a taxi, the passenger
"assumes the risk that the driver may exercise his right to stop
briefly along the way."  *Woodrum*, 202 F.3d at 11.  Whether a
passenger assumes the risk of searches and seizures subsequent
to a brief stop requires an assessment of the reasonableness of
the searches and seizures.  *Id. (*employing balancing test from
*Brown* v. *Texas*, 443 U.S. 47, 50 (1979)).  After conducting this
analysis, the court concluded that a "voluntary, properly
conducted TIPS stop passes the Supreme Court balancing test,"
and that the stop at issue was "within the purview of the

16

consent" to TIPS because the stop was conducted based on the
police officer's suspicion that the passenger had committed a
nearby violent crime, such that the stop was necessary to ensure
the driver's safety, consistent with the purpose of TIPS.  *Id.*
at 12-13.

Although *Woodrum* does not definitively establish the
principle, dicta in the opinion and the reasoning employed
therein strongly suggest that the First Circuit would recognize
a reasonable expectation of privacy for a passenger in the rear
passenger area of a livery car.  Here, the livery car driver was
dispatched to 4 Wakullah Street to pick up passengers for a
fare.  He carried three passengers, one of whom was Dardy, who
all sat in the backseat due to the livery car company policy,
and who dictated the direction and destination of the car,
albeit with some confusion.  Although it is unclear whether the
defendant himself, rather than his fellow passengers, planned to
pay for the ride,[9] that factor is not determinative where the
totality of the circumstances suggests that Dardy and his fellow
passengers had the ability to regulate access to and the

_____

[9] Dardy's affidavit submitted with his motion to suppress stated
only that he was a passenger in the livery car, and not that he
paid for the ride.  *Cf. United States* v. *Symonevich*, 688 F.3d
12, 21 & n.6 (1st Cir. 2012).  Dardy suggested in the police
interview following his arrest that he paid or planned to pay
for at least part of the ride.

17

direction of the vehicle during the course of their ride, and had the reasonable expectation that they could do so. *See Almeida*, 748 F.3d at 47.

Although this issue is close, for the purposes of this motion to suppress, I have concluded that Dardy, as a livery car passenger, asserted a possessory interest in the livery car for the course of his ride in that car. He had a reasonable expectation of privacy in the rear passenger area of that car for that period. *See Symonevich*, 688 F.3d at 21 n.6. Accordingly, Dardy could properly challenge the legality of the searches and seizures following the lawful traffic stop of the livery car.

   3.  The Resulting Searches and Seizures Were Lawful

I turn now to whether the following searches and seizures satisfy the two-step *Terry/McGregor* inquiry: Officer Connolly's (a) exit orders to Brown; (b) opening of the car door, viewing and later seizing the firearm from the floor of the rear passenger area of the car; and (c) patfrisk of Dardy. In assessing whether these searches and seizures were reasonable, I consider whether there was both objective and subjective suspicion, that is, whether there was "an objectively reasonable basis to suspect that weapons were present" and whether "the

officer in fact entertain[ed] such a suspicion." *McGregor*, 650 F.3d at 820.

### a. The Exit Orders Were Lawful

The Fourth Amendment is not implicated when an officer orders passengers to exit a vehicle while it is stopped for a traffic violation. *See Wilson*, 519 U.S. at 410, 414-15; *Michigan* v. *Long*, 463 U.S. 1032, 1047-48 (1983); *McGregor*, 650 F.3d at 820. For this reason, Officer Connolly's orders that Brown and then Dardy exit the car were not unlawful in and of themselves, regardless of any suspicion that Brown and Dardy were armed.

### b. The Opening of the Car Door, the Viewing and Subsequent Seizing of the Firearm Were Lawful

Officer Connolly's slight entrance into the vehicle and viewing of the inside of the vehicle with his flashlight, resulting in his viewing of the firearm, was also lawful. Officer Connolly opened the driver's side rear door, illuminated the rear of the vehicle with his flashlight, and when Brown did not respond quickly to the exit order, leaned in to ensure Brown's compliance with the exit order. After ensuring Brown's exit, Officer Connolly looked in the car again with his flashlight at Dardy.[10]  I find it was at this point that Officer

---

[10] I understand Officer Connolly's testimony at the evidentiary

Connolly viewed the firearm on the floor near Dardy's feet.  The officer then instructed Dardy to put his hands near his face and to exit the vehicle.

The First Circuit has concluded on several occasions that removal of a vehicle occupant by a police officer is proper where the occupant refuses to comply with an exit order.  *See United States* v. *Ruidíaz*, 529 F.3d 25, 33 (1st Cir. 2008); *United States* v. *Soares*, 521 F.3d 117, 121 (1st Cir. 2008). Indeed, "[t]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham* v. *Connor*, 490 U.S. 386, 396 (1989).

It is not clear that either Brown or Dardy actively resisted or fully refused to comply with the exit order. Officer Connolly testified that Brown put his hands up as requested but did not respond to the exit request as quickly as he would have liked; the officer did not provide any other indication that Brown was not cooperative.  Similarly, Officer

---

hearing to be that he did not view the gun in the car until <u>after</u> he assisted Brown in exiting the car.  This is in contrast to his grand jury testimony, which suggested that he viewed the gun while he was initially assisting Brown.  I credit his testimony in the hearing before me.

Connolly testified that Dardy complied, albeit slowly, with his requests to put his hands by his face and exit the vehicle.

Nevertheless, the officer was justified in leaning in the second time (after Brown had been removed from the vehicle), and his resulting viewing and seizure of the firearm is admissible under the plain view exception.  A warrantless search is lawful under the plain view exception if "(1) the seizing police officer lawfully reached the position from which he could see the item in plain view; (2) the seizure satisfied the probable cause standard; and (3) the seizing officer had a 'lawful right of access to the object itself.'"  *United States* v. *Antrim*, 389 F.3d 276, 283 (1st Cir. 2004) (quoting *United States* v. *Jones*, 187 F.3d 210, 219-21 (1st Cir. 1999)).

While Officer Connolly was lawfully removing Brown from the vehicle, he observed Dardy bending over; the incriminating character of this position in this context was "immediately apparent" and gave the officer reasonable concern for his safety.  *See Coolidge* v. *New Hampshire*, 403 U.S. 443, 465 (1971); *Jones*, 187 F.3d at 220.  Officer Connolly therefore had a basis on which to lean into the vehicle and to view the passengers, and what was in plain sight around them, with his flashlight: he had reasonable suspicion that the passengers may be armed and dangerous.  *See Ruidíaz*, 529 F.3d at 33.  In a

traffic stop context, an officer, of course, must have "some articulable, reasonable suspicion" that an occupant is armed and potentially dangerous in order to conduct a search.  *See McGregor*, 650 F.3d at 820; *United States* v. *Cook*, 277 F.3d 82, 85 (1st Cir. 2002) (citations omitted); *see also United States* v. *Dunbar*, 553 F.3d 48, 56-57 (1st Cir. 2009).  This reasonableness inquiry is "fact-sensitive" and based on "objective criteria" and common sense, *Ruidíaz*, 529 F.3d at 29, but also requires some "deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior."  *Cook*, 277 F.3d at 85 (citing *United States* v. *Chhien*, 266 F.3d 1, 6 (1st Cir. 2001)).

As Officer Connolly approached the livery car, he knew the following: a shooting had occurred nearby earlier in the evening, it was dark, the other officers had pulled over the livery car for some reason, one of the car's passengers had fled and in so doing held his waistband in a manner consistent with carrying a weapon, there were other unknown individuals remaining in the car, and he was the only officer remaining on the scene.[11]  He did not know one way or the other whether any of

---

[11] I consider the collective knowledge of the officers involved in the stop in determining whether the resulting searches and seizures were lawful, to the extent doing so is reasonable. *See United States* v. *Cook*, 277 F.3d 82, 86 (1st Cir. 2002)("where

the vehicle's remaining occupants posed a threat to his safety
or that of the other occupants.  *See United States* v. *Pontoo*,
666 F.3d 20, 30 (1st Cir. 2011).

The flight of one of the passengers, in and of itself, is
strongly suggestive of criminal activity, see *Illinois* v.
*Wardlow*, 528 U.S. 119, 124 (2000), and can inform an officer's
assessment of the threat posed by remaining passengers.  Officer
Connolly could reasonably have been, and indeed testified that
he was, concerned for his safety and that of the individuals in
the vehicle.  *See Michigan*, 463 U.S. at 1050.  In addition, even
if Officer Connolly had not observed the firearm itself prior to
ordering and assisting Brown out of the vehicle, Officer
Connolly observed Dardy bend down out of sight, as if he were
placing or retrieving something from underneath the seat.
Dardy's movements, coupled with Brown's slowness in exiting the
vehicle, was again cause for concern regarding the officer's and
the other occupants' safety.  "[S]louching, crouching, or any

---

law enforcement officers are jointly involved in executing an
investigative stop, the knowledge of each officer should be
imputed to others jointly involved in executing the stop").
Although Officer Connolly did not see the passenger exit the
vehicle and begin running, he was aware that the other officers
were chasing a fleeing passenger and made his own brief
observation of the individual clutching his waistband.  The
other officers' knowledge, to the extent that it is slightly
more robust, may be imputed to Officer Connolly.

other arguably evasive movement, when combined with other
factors particular to the defendant or his vehicle, can add up
to reasonable suspicion." *Woodrum*, 202 F.3d at 7 (citations
omitted); *see also United States* v. *Martinez*, 762 F.3d 127, 130
(1st Cir. 2014) (officers' perception of defendants' hand
movements as "furtive and suspicious" supported finding of
reasonable suspicion).

What is presented here is enough to justify Officer
Connolly's view into the vehicle, at which point he saw the
firearm in plain sight. *Cf. Martinez*, 762 F.3d at 132
(defendant's known involvement in past crimes, "the reaction of
a car full of gang members when a police car approached," and
defendant's "refusal to keep hands visible" supported reasonable
suspicion); *McGregor*, 650 F.3d at 820, 822-23 (known criminal
history and gang ties of occupants, and their apparent
nervousness, contributed to reasonable suspicion); *Cook*, 277
F.3d at 86-87 (officers' observation of defendant leaving
ongoing exchange in known drug trafficking area when police
approached and then engaging in furtive behavior in vehicle
contributed to reasonable suspicion).  The flight of another
occupant who appeared to be armed, the defendant's furtive
behavior, Brown's hesitation to exit the vehicle, and the
officer's awareness of earlier criminal activity in the

immediate area, when considered both objectively and in light of the officer's expertise in the field and subjective knowledge, supported Officer Connolly's reasonable suspicion that the passengers had access to a weapon and could pose a threat to his safety.[12]  *See McGregor*, 650 F.3d at 820; *see also Soares*, 521 F.3d at 120-21 (occupants' movements, including bending over as if putting object on floor; defendant's refusal to remain still and keep hands in air; and that stop occurred in middle of night in crime-ridden area, created reasonable suspicion).[13]

---

[12] The defendant contends that because neither he nor Brown was wearing a red hooded sweatshirt, the officer could not have thought that they were involved in the earlier shooting. Suspected association with earlier criminal activity is not required for reasonable suspicion justifying a warrantless search.  Rather, the inquiry here is whether, under the totality of the circumstances, the officer reasonably suspected that the occupants of the vehicle were armed and dangerous.  *See Almeida*, 748 F.3d at 47.

[13] This case also bears similar factual circumstances to those in *Commonwealth* v. *Torres*, 745 N.E.2d 945, 950 (Mass. 2001), in which the Supreme Judicial Court concluded that the police officer had a reasonable belief that the vehicle occupants were dangerous and therefore was justified in ordering the defendant and the other occupants out of the vehicle (where, under Massachusetts case law, in contrast to federal case law, reasonable suspicion is necessary for an exit order).  This determination was based on a number of observations, including that one passenger fled when the vehicle stopped, suggesting possession of illicit goods; the remaining occupants were "bent over" and "messing with something," suggesting efforts to conceal or retrieve a weapon, and they continued this behavior after the officer ordered them to put their hands up; and the occupants outnumbered the officer and therefore threatened his safety and that of the general public.  *Id*. at 950-51.

Accordingly, the viewing and subsequent seizing of the firearm were lawful.

### c. The Patfrisk Was Lawful

Finally, the patfrisk of Dardy was lawful given the events that preceded the frisk.  "Once an officer has formed a reasonable belief that a detained person may be armed and dangerous, a pat-down for protective purposes is, without more, deemed reasonably related in scope to the stop."  *Ruidíaz*, 529 F.3d at 33 (citing *Terry*, 392 U.S. at 30; *United States* v. *Ivery*, 427 F.3d 69, 72 (1st Cir. 2005)); *see Pontoo*, 666 F.3d at 30.  Here, Officer Connolly observed a firearm at the defendant's feet inside the livery car.  Given this observation, he clearly had a reasonable belief that the defendant was armed and was justified in conducting a protective search of his person to locate any additional weapons.

### III. CONCLUSION

For the reasons set forth above, I have DENIED the defendant's motion to suppress (Dkt. No. 60).


*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE